# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| ELIZABETH ARMENAKIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:04 CV 755JM |
| | ) | |
| TOP NOTCH FAMILY | ) | |
| RESTAURANT & BAKERY, *et al.,* | ) | |
| Defendants. | ) | |

## MEMORANDUM and OPINION

Plaintiff Elizabeth Armenakis ("Armenakis") filed this action alleging

discrimination, in the form of a hostile environment and termination of her

employment, on the basis of her race and gender in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). She named as

defendants her employer Top Notch Family Restaurant & Bakery ("Top Notch"),[1] its

owner, Peter Bourounis, and its manager, Kenneth Whalen.[2] Her complaint also alleges

---

[1] The court suspects that Top Notch Family Restaurant & Bakery may simply be the name of a business owned by defendant Bourounis, and not an entity capable of being sued in its own name. Other than a very brief argument by Bourounis that his presence is redundant, the parties have not addressed this issue. Bourounis argues that he should be granted summary judgment because either he, or Top Notch, employs Armenakis, but they cannot both be her employer. Clearly, Bourounis knows whether or not he is Armenakis's employer, and the court will not grant him a summary judgment with the possibility of discovering later that Top Notch Family Restaurant & Bakery is only a fictitious business name and that Bourounis was the proper defendant all along.

[2] The complaint actually named "John Doe # 1, otherwise known as Kenny _____, manager." In their answer, defendants admitted that plaintiff was referring to Kenneth Whalen, and the court treats the complaint as so amended.

several related state-law theories of liability. Defendants have filed a joint motion for partial summary judgment, addressing Armenakis's federal claims only.

On November 28, 2005, Armenakis's attorney filed a motion to withdraw, stating that the attorney-client relationship had broken down over an issue as to which he had warned Armenakis that, should she reject his advice, he would find it necessary to move to withdraw. The day after the motion to withdraw was filed, the defendants filed their joint motion for partial summary judgment. The very next day, Armenakis's attorney was allowed to withdraw, and the court gave Armenakis notice that she had thirty days to advise whether she intended to retain new counsel, or would represent herself. She has not responded to that order.

Because of that failure, on January 17, 2006, the court gave Armenakis notice that it presumed she was now proceeding *pro se*, gave her notice of the possible consequences of failing to respond to a motion for summary judgment, and ordered her to file her response no later than February 17, 2006. To date, she has failed to file any response or to take any other steps to prosecute her case. Under this court's local rules, Armenakis's failure to respond means that defendants' version of the material facts, if properly supported, will be deemed to exist as undisputed facts. However, defendants' motion cannot be granted unless those facts show that they are entitled to a judgment as a matter of law: summary judgment cannot be granted to penalize Armenakis for failing to file a response. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *Reales v.*

*Consolidated Rail Corp.*, 84 F.3d 993, 997 (7th Cir. 1996); *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir. 1993).

## I. Facts

The court now summarizes only those facts which are necessary to explain the court's resolution of the motion. The majority of these facts have been established as undisputed by the exhibits defendants use to support their motion. In crafting their motion, defendants assumed that the assertions made by Armenakis in her deposition would be presumed true, even where they offer contrary evidence, thus properly recognizing the manner in which the court must view the motion. The court proceeds with its discussion and analysis on that basis: that is, although Armenakis has not responded to defendants' motion pointing out the facts in dispute, the portions of her deposition testimony that defendants have cited in their description of the facts will be presumed true.

Armenakis is of mixed-race parentage and considers herself to be both black and white. She was employed as a waitress at the Top Notch for the last three or four months of 2003.[3] She had worked there previously, but quit when she felt that she wasn't being scheduled for enough hours. Other than that, the first time she worked there she didn't have any problems. Even though she quit because she wanted to work more hours, she may not have had another job waiting to start, which of course means

---

[3] There is a dispute as to her starting date, and as to whether she was terminated on November 30 or on December 14, but those disputes are not material to resolution of the motion.

she would have had no hours to work. She explains this incongruity by noting that

"[s]ometimes we do stupid things in life, you know. I can't explain that one. I don't

know." Armenakis dep. at 20.

The second time she worked at Top Notch she would have arguments with

Bourounis about him touching her "all of the time." As Armenakis described it:

> [H]e would pass me through the kitchen, he wants to brush
> up against my butt. Just always touchy-feely, just comments
> after comments[.] . . . [H]e was always saying little
> remarks. . . . He wants to do it to me. He thinks I'm
> pretty, he thinks my ass looks good today.

Armenakis dep. at 31. She didn't quit her job, however, because:

> I didn't want to have to stop and go through — I had to go
> through the whole process of looking for another job and all
> of that, filling out the applications and all of that, when I
> already had the job right there.

Armenakis dep. at 37.

On a few occasions Bourounis offered her $100 dollars to have sex with him. She

accepted this proposition on two occasions, the last of which was in November.

Armenakis dep. at 28-29. At some point after the second encounter but before her

termination, Armenakis informed Bourounis that she wanted to terminate their sexual

relationship. As she describes his reaction:

> He wasn't happy. . . . [He said] I'll lose my job . . .
> That I would lose my job if I didn't continue to sleep with
> him.

Armenakis dep. at 76-77.

4

On December 13, 2003, a Saturday night,[4] Armenakis waited on a large group—perhaps as many as 65 people—by herself and was, of course, very busy. Armenakis dep. at 22-23. While she was trying to take care of this group, she had an incident with Whalen, who "liked to kid and joke and play with us waitresses and stuff at the wrong times." Armenakis dep. at 23. On this occasion, she was "running food and he was trying to cut up and giggle and play, and he called me a "nigger bitch," and I went off." Armenakis dep. at 24. After serving the food she had been carrying at the time, she came back and "called him a motherfucker. Told him not to say that like that to me again" Armenakis dep. at 25. He responded by telling her that "[h]e was just playing." Id. She says "[i]t was no big deal after that." Armenakis dep. at 24. Other than that incident, Whalen had never used any racial epithets, and she thought "he was an all right guy. He was good to work for." Armenakis dep. at 30-31.

The following day when Armenakis came to work—early, according to her—Whalen told her that she was fired because six customers from the previous evening had complained about her. Armenakis dep. at 21-22. Whalen recalls the events differently. Armenakis was often late—something she grudgingly admitted in her deposition, Armenakis dep. at 26-27—and was late on this occasion. Whalen decided to

---

[4] The court is using the dates that Armenakis said were correct during her deposition. Using the dates that defendants claim are correct, the incident about to be described in the text would have occurred in November, much closer in time to Bourounis's alleged threat.

warn her that if she was late again, she would be fired. Whalen affidavit at ¶ 7. When he

did so, he says that she:

> [R]esponded to my warning by going off, yelling and
> cursing at me in front of customers. At that point, I decided
> to fire her on the spot and told her to leave the restaurant
> because she was fired.

Whalen affidavit at ¶ 8. According to Whalen, this decision was solely his and

Bourounis did not request or suggest that Armenakis be fired. Whalen affidavit at

¶¶ 11, 12, 18. Whalen had no knowledge that Bourounis and Armenakis had been

involved in a sexual relationship. Whalen affidavit at ¶¶ 17.

## II. Analysis

### A. Discriminatory termination

Title VII prohibits an employer from firing an employee because of the

individual's race or sex. 42 U.S.C. § 2000e-2(a)(1). The ultimate issue that a plaintiff

must always establish to succeed on such a claim is that the defendant intentionally

discriminated against her, that is, terminated her employment because of her race,

gender or other protected factor. *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561

(7th Cir. 2004). A plaintiff can do so using either the direct method or the indirect

method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817,

36 L. Ed. 2d 668 (1973). *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir.

2002).

Under the direct method, a plaintiff has to offer direct and/or circumstantial evidence of the "smoking-gun" type, that is, "evidence that the trier of fact can interpret as an acknowledgment of the employer's discriminatory intent. " *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997); *Raymond*, 442 F.3d at 610 ("[d]irect evidence of discrimination would amount to an admission by SBC that Raymond was terminated on the basis of her race, sex, or age.") Most plaintiffs lack evidence of that nature, and attempt to prove their case using the indirect method. A plaintiff's initial burden under the indirect method is to show: "(1) [s]he is a member of a protected class; (2) [s]he was meeting his [her] employer's legitimate expectations at the time of the alleged adverse action; (3) [s]he was subjected to an adverse employment action; and (4) the employer treated similarly situated employees not in the protected class more favorably." *Scaife v. Cook County*, 446 F.3d 735, 739 (7th Cir. 2006).

In moving for summary judgment, defendants argue that Armenakis's evidence limits her to the indirect method of proof, and using that method she cannot establish a prima facie case because the evidence shows that she was not meeting her employer's legitimate expectations. The court agrees that Armenakis cannot use the direct method to create an issue of fact as to whether she was terminated on account of her gender. She has offered no evidence to rebut Whalen's affidavit in which he affirms that he alone made the decision to terminate her employment, without any input from Bourounis and with knowledge of neither the relationship between Armenakis and Bourounis nor of Bourounis's threat to terminate Armenakis' employment.

Neither can Armenakis use the direct method to proceed on her claim that her termination was on account of her race. Although Whalen made the vulgar and tasteless "nigger bitch" remark the night before he terminated her employment, Armenakis herself characterizes the comment as one made in a situation where Whalen was unsuccessfully trying "to cut up and giggle and play," and that after she told him off, "it was no big deal."[5]

Nevertheless, she stated during her deposition that she viewed the fact that Whalen had made the statement, and been the one who fired her, as race discrimination. Armenakis dep. at 36. This apparent incongruity results from Armenakis arriving at that conclusion *ipso facto*: it is clear from her description of the incident and of her general working relationship with Whalen that she does not view his motivation in firing her as race-based. In fact, when she had the opportunity during her deposition to offer her view whether her termination was on account of her gender or her race, her answer was: "I claim I was terminated – I don't know why they terminated me." Armenakis dep. at 37.

Without any direct or circumstantial evidence showing that the reason for her termination was Whalen's discriminatory animus, Armenakis must establish a prima facie case of discrimination using the indirect method before defendants have the

---

[5] This seems at odds with Armenakis's assertion that she was fired the next day, which could mean that she is mistaken about the dates or that the incident—which Whalen denies—did not occur. For the purposes of summary judgment, however, the court accepts Armenakis's version of the events.

burden of stating a non-discriminatory reason for terminating her employment. As

noted above, one of the elements of Armenakis's indirect prima facie case is showing

that her work performance was meeting her employer's legitimate expectations.

The only evidence before the court is that Armenakis was *not* meeting her

employer's legitimate expectations. According to Whalen, she was consistently late and

often came to work wearing a T-shirt instead of the required uniform. Whalen aff. at

¶¶ 6, 10. When he decided to give her a final warning not to be late again, she cursed at

him in front of customers. Whalen aff. at ¶ 8. Without any evidence offered by

Armenakis to create an issue of fact as to whether she was meeting her employer's

expectations, defendants are entitled to summary judgment on Armenakis's termination

claim. *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002); *Coco v. Elmwood

Care, Inc.*, 128 F.3d 1177, 1179-80 (7th Cir. 1977) ("should the plaintiff strike out at the

first stage by failing to show that he was meeting his employer's bona fide expectations,

there is no occasion to go further").

Even were the court to ignore *Coco* because of cases like *United States Postal Serv.

Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)

("[w]here the defendant has done everything that would be required of him if the

plaintiff had properly made out a prima facie case, whether the plaintiff really did so is

no longer relevant"),[6] Armenakis would fare no better. She would then have to show

---

[6] *See also Hague v. Thompson Distribution Co.*, 436 F.3d 816, 822-23 (7th Cir. 2006)
(explaining *Peele* and *Coco*).

that Whalen's stated reason for firing her is a pretext for discrimination. *Whittaker v.*

*Northern Illinois University*, 424 F.3d 640, 647 (7th Cir. 2005).

Simply put, on the evidence of record, Whalen's crude attempt at a joke the night

before he fired Armenakis by itself is not enough to create an issue of fact suggesting

that he is lying to cover the fact that he actually decided to terminate her because of her

race or her gender. Armenakis admitted that the failed joke was the only time that

Whalen had ever used a racial epithet, and that he was an "all right" guy who was good

to work for. No reasonable jury could find for Armenakis on her claim that she was

terminated because of her race or her gender.[7] Accordingly, the defendants are entitled

to summary judgment on her termination claim.

*B. Sexual and/or Racial Harassment Creating a Hostile Environment*

It is well-recognized that a workplace "permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the

conditions of the victim's employment" is a "hostile environment" that itself violates

---

[7] Although Whalen denies that the incident on Saturday night even occurred, the
court must accept as true Armenakis's assertion that it did, as well as her assertions that
she was early for work on Sunday and that Whalen fired her because he said that
customers from the night before had complained about her. Thus, it must be assumed
that Whalen's stated reason for firing her is a pretext for *something*. There is no doubt
that the incident the night before could have influenced Whalen's decision to fire
Armenakis the next day. As Armenakis describes it, she responded to an incident where
she realized that Whalen was attempting to joke by calling him a "motherfucker." It is
possible that she made Whalen angry, and that caused him to decide that he had
tolerated her coming in late for work and without her uniform for long enough. The
point is, whether or not Whalen is hiding something, nothing in the evidence suggests
that what he is hiding is a discriminatory animus.

Title VII. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295

(1993).

> An actionable hostile environment claim requires the
> plaintiff to prove: (1) that the work environment was both
> subjectively and objectively offensive; (2) that the
> harassment was based on membership in a protected class;
> (3) that the conduct was severe or pervasive; and (4) that
> there is a basis for employer liability.

*Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005). The Court of

Appeals has often remarked that "the threshold for plaintiffs is high, as '[t]he workplace

that is actionable is one that is 'hellish.''" *Whittaker*, 424 F.3d at 645 (*quoting Perry v.

Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir.1997)).

Moving for summary judgment, defendants argue that the evidence, even when

viewed in Armenakis's favor, does not show an environment where racial or sexual

harassment was so objectively and subjectively offensive, severe and pervasive as to

violate Title VII. As to racial harassment, this is undoubtedly true. A one-time incident

which the employee finds offensive, but understands to be a poor attempt at a joke, is

not so severe or pervasive as to be actionable. *Cf. Harris v. Forklift Systems, Inc.*, 510 U.S.

17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (mere utterance of epithet does not

sufficiently affect the conditions of employment to implicate Title VII); *Faragher v. City of

Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) ("'simple

teasing' [citation omitted], offhand comments, and isolated incidents (unless extremely

serious) will not amount to discriminatory changes in the 'terms and conditions of

employment'") (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998).

As to Armenakis's claim of sexual harassment creating a hostile environment, defendants argue that she obviously did not find Bourounis's conduct in the workplace—brushing up against Armenakis and commenting on her appearance—subjectively offensive because she was not even looking for another job. Given that she admitted in her deposition that waitress jobs were not terribly difficult to get, and that she had quit working at the Top Notch on a prior occasion when she may not even have had another job lined up, her inertia is somewhat telling.

While it may be true that Armenakis did not find Bourounis's fondling and come-ons at work so offensive as to be actionable, defendants completely ignore Armenakis's assertion that Bourounis threatened that if she did not continue to have intercourse with him she would lose her job. Ignoring that evidence doesn't minimize its importance. Explaining its prior decision in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986), the Court stated: "We assumed, and with adequate reason, that if an employer demanded sexual favors from an employee in return for a job benefit, discrimination with respect to terms or conditions of employment was explicit."

Were a jury to believe Armenakis's testimony, consistent with her deposition, that Bouronis threatened her with loss of her job if she did not continue to engage in sexual relations with him, that alone would be actionable sexual harassment. As a

result, summary judgment cannot be granted to Bourounis/Top Notch on Armenakis's claim of a sexually-hostile environment.

For the foregoing reasons, defendants' joint motion for summary judgment (DE # 21) is **GRANTED IN PART** and **DENIED IN PART**. Although this case is, therefore, still pending on Armenakis's sexual harrassment/hostile environment claim against Bourounis/Top Notch, and state-law claims against (apparently) all defendants, it is not clear that Armenakis is any longer interested in prosecuting. She has ignored two orders directed to her by Magistrate Judge Nuechterlein. The final pretrial conference setting, currently July 13, 2006, at 10:00 a.m. in Hammond before the undersigned, is now **VACATED**. The final pretrial conference will be on July 10, 2006, at 11:00 a.m. in South Bend before Judge Nuechterlein. **THE COURT NOW GIVES PLAINTIFF ARMENAKIS NOTICE THAT FAILURE TO ATTEND THE FINAL PRETRIAL CONFERENCE WILL RESULT IN DISMISSAL OF HER CASE.** Further, Armenakis must fully comply with all other pretrial deadlines in this case, such as serving her portions of the pretrial order on defendants by June 26, 2006, or risk dismissal.

**SO ORDERED.**

ENTER: June 6, 2006

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT